UNITED STATES DISTRICT COURT
DISTRICT OF IDAHO

| | |
|---|---|
| SHANNON DICKINSON<br><br>    Plaintiffs,<br><br>vs.<br><br>EDWARD D. JONES & CO., L.P., a Missouri limited partnership,<br><br>    Defendant. | Case No.: 4:14-cv-00397-REB<br><br>**MEMORANDUM DECISION AND ORDER RE:**<br><br>**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**<br>**(Docket No. 26)** |

Now pending before the Court is Defendant's Motion for Summary Judgment (Docket No. 26). Having carefully considered the record, participated in oral argument, and otherwise being fully advised, the Court enters the following Memorandum Decision and Order:

## I. BACKGROUND

Defendant Edward D. Jones & Co., L.P. ("Edward Jones") is a full-service brokerage firm, with branch offices throughout the United States. The majority of Edward Jones' branch offices are operated by a single Financial Advisor ("FA") who is responsible for maintaining the branch, servicing existing clients, and marketing the firm's services to potential clients. FAs are typically supported by a singe Branch Office Administrator ("BOA") whose primary responsibility is to assist the FA with office administration.

In June 2006, Edward Jones hired Plaintiff Shannon Dickinson as a BOA in one of its Idaho Falls, Idaho branches. From June 2006 through September 2007, Dickinson worked alongside the branch's FA, Jeff Jones. In September 2007, Maurice Miller replaced Jones as the branch's FA. Dickinson remained the branch's BOA until she was fired on November 30, 2012.

**MEMORANDUM DECISION AND ORDER - 1**

Although there are many moving parts surrounding the events leading up to Dickinson's termination, things ultimately came to a head during her performance review. At that time Miller and Dickinson had what can best be described as a disagreement. While there is a factual dispute over what exactly was said during that review, it appears clear that Dickinson left the meeting over Miller's objections. Dickinson was fired soon thereafter by Edward Jones' Associate Relations ("AR") department. This lawsuit followed.

In her Complaint, Dickinson asserts federal and state law claims for religious discrimination, disability discrimination, and retaliation. Specifically, Dickinson alleges that Edward Jones, through Miller, discriminated against her because of her religion; that Miller perceived her as having a disability and discriminated against her on that basis; and that Miller (and Edward Jones' AR employees) illegally retaliated against her for complaining about religious and disability discrimination.

Edward Jones now moves for summary judgment, arguing that Dickinson's claims should be dismissed because, (1) generally speaking, a traditional "cat's paw" theory of liability does not exist to connect Miller's allegedly-discriminatory conduct with Dickinson's actual termination; and, (2) more particularly, there is no evidence of any (a) religious discrimination, (b) disability discrimination, or (c) actionable retaliation.

## II. DISCUSSION

**A.    Legal Standards**

    1.    Summary Judgment Standard

Summary judgment is appropriate where a party can show that, as to any claim or defense, "there is no genuine dispute as to any material fact and the movant is entitled to

**MEMORANDUM DECISION AND ORDER - 2**

judgment as a matter of law." Fed. R. Civ. P. 56(a).  One of the principal purposes of summary judgment "is to isolate and dispose of factually unsupported claims . . . ." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-34 (1986).  It is "not a disfavored procedural shortcut," but is instead the "principal tool[ ] by which factually insufficient claims or defenses [can] be isolated and prevented from going to trial with the attendant unwarranted consumption of public and private resources." *Id*. at 327.  "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).  There must be a genuine dispute as to any *material* fact – a fact "that may affect the outcome of the case." *Id*. at 248.

The evidence must be viewed in the light most favorable to the non-moving party, and the Court must not make credibility findings. *Id*. at 255.  Direct testimony of the non-movant must be believed, however implausible. *Leslie v. Grupo ICA*, 198 F.3d 1152, 1159 (9th Cir. 1999).  On the other hand, the Court is not required to adopt unreasonable inferences from circumstantial evidence. *See McLaughlin v. Liu*, 849 F.2d 1205, 1208 (9th Cir. 1988).

The moving party bears the initial burden of demonstrating the absence of a genuine dispute as to a material fact. *See Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir. 2001) (en banc).  To carry this burden, the moving party need not introduce any affirmative evidence (such as affidavits or deposition excerpts) but may simply point out the absence of evidence to support the nonmoving party's case. *See Fairbank v. Wunderman Cato Johnson*, 212 F.3d 528, 532 (9th Cir. 2000).

This shifts the burden to the non-moving party to produce evidence sufficient to support a jury verdict in his favor. *See Devereaux*, 263 F.3d at 1076.  The non-moving party must go

**MEMORANDUM DECISION AND ORDER - 3**

beyond the pleadings and show "by her [ ] affidavits, or by the depositions, answers to interrogatories, or admissions on file" that a genuine dispute of material fact exists. *Celotex*, 477 U.S. at 324.

    2.    *McDonnell Douglas* Standard

Title VII of the Civil Rights Act of 1964, as amended ("Title VII"), prohibits an employer from discriminating against an individual because of (among other things) an individual's religion. *See* 42 U.S.C. § 2000e-2(a)(1). Likewise, the Americans with Disabilities Act ("ADA") prohibits an employer from discriminating against a qualified individual "on the basis of disability." 42 U.S.C. § 12112(a). Both Title VII and the ADA prohibit an employer from retaliating against an employee for engaging in protected activity. *See* 42 U.S.C. § 2000e-3(a) (Title VII); 42 U.S.C. § 12203(a) (ADA). Dickinson claims her termination violated each of these statutory prohibitions.

Dickinson's religious and disability discrimination claims, as well as her retaliation claim, proceed under the now-familiar *McDonnell Douglas* three-step burden-shifting framework. First, Dickinson must establish a prima facie case of discrimination/retaliation; second, if she does, Edward Jones must then articulate a legitimate nondiscriminatory reason for its conduct; and third, if it does, Dickinson must then demonstrate that the articulated reason is a pretext for discrimination/retaliation. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04 (1973); *see also Wallis v. J.R. Simplot Co.*, 26 F.3d 885, 888-89 (9th Cir. 1994) (applying framework to Title VII claims); *Snead v. Metro Prop. & Cas. Ins. Co.*, 237 F.3d 1080, 1093 (9th Cir. 2001) (applying framework to ADA claims); *Hashimoto v. Dalton*, 118 F.3d 671, 680 (9th Cir. 1997) (Title VII retaliation claim); *Pardi v. Kaiser Found. Hosp.*, 389 F.3d 840, 849 (9th Cir. 2004) (ADA retaliation claim).

**MEMORANDUM DECISION AND ORDER - 4**

**B.     Questions of Fact Exist to Preclude Summary Judgment on Some, but Not All, of Dickinson's Claims Against Edward Jones**

    1.    <u>Dickinson's Religious and Disability Discrimination Claims</u>

        *a.*    *The Cat's Paw Theory*

Preliminarily, Edward Jones argues that, even if Mr. Miller's alleged conduct represents a discriminatory animus, there is no evidence that Dickinson suffered an adverse employment action as a result of *that* animus. *See* Mem. in Supp. of MSJ, pp. 2-3, 9-11, 14 (Docket No. 26, Att. 1). Instead, according to Edward Jones, Dickinson was terminated by Edward Jones' AR employees – Laura Faulstich and Martha Schneberger – as a result of Dickinson's admitted insubordinate conduct during her performance review. Hence, Edward Jones would argue, because Miller was not consulted on Faulstich's and Schneberger's decision to fire Dickinson, a "cat's paw"[1] theory of liability cannot exist. *See id*. at p. 9 ("[I]n order to establish that there is any causal connection between the alleged discriminatory animus and the adverse employment action (the termination), [Dickinson] must establish a 'cat's paw' theory of liability.").

Under the "cat's paw" theory, "if a supervisor performs an act motivated by [discriminatory] animus that is intended by the supervisor to cause an adverse employment

---

[1] As explained by Justice Scalia:

> The term "cat's paw" derives from a fable conceived by Aesop, put into verse by La Fontaine in 1679, and injected into United States employment discrimination by [Seventh Circuit Judge Richard] Posner in 1990. In the fable, a monkey induces a cat by flattery to extract roasting chestnuts from the fire. After the cat has done so, burning its paws in the process, the monkey makes off with the chestnuts and leaves the cat with nothing. A coda to the fable (relevant only marginally, if at all, to employment law) observes that the cat is similar to princes who, flattered by the king, perform services on the king's behalf and receive no reward.

*Staub v. Proctor Hosp.*, 562 U.S. 411, 415 n.1 (2011) (citing *Shager v. Upjohn Co.*, 913 F.2d 398, 405 (7th Cir. 1990)). "In the context of employment litigation, the fable serves as a cautionary tale to employers against the rubberstamping of a supervisor's recommendations." *Glynn v. City of Stockton*, 2016 WL 4009809, *11 n.2 (E.D. Cal. 2016).

**MEMORANDUM DECISION AND ORDER - 5**

action, and if the act is a proximate cause of the ultimate employment action, then the employer is liable." *Staub*, 562 U.S. at 422.  "In 'cat's paw' cases, courts regard the biased subordinate's actions as direct evidence of discrimination." *See Robles v. Agreserves, Inc.*, 2016 WL 323775, *27 (E.D. Cal. 2016) (citing *Nichols v. Michigan City Plant Planning Dept.*, 755 F.3d 594, 600 (7th Cir. 2014)).

To establish a "cat's paw" theory, the plaintiff must show that (1) a supervisor performs an act motivated by discriminatory animus, (2) that is intended by the supervisor to cause an adverse employment action, and (3) that act is a proximate cause of the ultimate employment action.  *See Staub*, 562 U.S. at 422.  "Since a supervisor is an agent of the employer, when he causes an adverse employment action the employer causes it; and when discrimination is a motivating factor in his doing so, it is a motivating factor in the employer's action . . . ." *Id*. at 421 (internal quotation marks and citation omitted).  "Proximate cause requires only some direct relation between the injury asserted and the injurious conduct alleged, and excludes only those links that are too remote, purely contingent, or indirect." *Id*. at 419 (internal quotation marks and citation omitted).  If an employer's independent investigation "results in an adverse action for reasons unrelated to the supervisor's original biased action," then the employer will not be liable. *Id*. at 421.  However, if the independent investigation "relies on facts provided by the biased supervisor," then the investigation is not actually independent, and the employer is liable.  *Id*. That is, a non-decisionmaker's biased report "may remain a causal factor if the independent investigation takes into account without determining that the adverse action was, apart from the supervisor's recommendation, entirely justified." *Id*.

Here, Edward Jones contends that there is no "biased report" that could allow Dickinson to establish a "cat's paw" theory of liability because (1) Miller reported to AR that Dickinson

**MEMORANDUM DECISION AND ORDER - 6**

had left the office against his instruction and said words to the effect of "I'm not asking you, I'm telling you," as she left;[2] and (2) Dickinson admitted that this had in fact occurred during a subsequent conversation with AR.[3] *See* Mem. in Supp. of MSJ, p. 10 (Docket No. 26, Att. 1)

---

[2] The record of the November 30, 2012 telephone call from Miller to Faulstich reads:

> Maury called and said he was giving Shannon her annual performance appraisal. He said during the appraisal, which was an Exceeds Expectations, that Shannon became upset by the ratings for different topics. Maury said he could see Shannon getting visibly upset and told her she needed to calm down and the overall rating was an E. Maury said she told him she was done with the conversation and wanted to get the RL or HR on the phone. Maury said he told her that they would not resolve it today however they would get HR involved and that he had spoken with someone. Maury then said Shannon went to her desk, got her purse, and said she was leaving. Maury said he told her "I am not giving you authorization to leave." He said Shannon turned to him and said "I am leaving and you can't stop me." Maury then said "then you better be prepared to find another job," as Shannon walked out of the office. I told Maury to give me a few minutes and I would call him back to discuss next steps.

Ex. K, p. 5 to Jaskowiak Decl. (Docket No. 26, Att. 16).

[3] The record of the November 30, 2012 telephone call from Faulstich and Schneberger to Miller reads in relevant part:

- Maury told her he controls things; we asked her to explain, and she clarified that he said "I'm the one who makes decisions here" and "you better be careful what you're doing b/c I'm still in control here."

- That Maury told her he contacted HR, had documentation, and she said she told him "so do I."

- She suggested RL Chris should "mediate" and that Maury told her it wouldn't be for today. She said "that's fine" and that she told him "call me when you get ahold of Chris."

- She gathered "up my books" and that Maury told her had concerns for her taking personal calls/personal time.

- Said the conv[ersation] happened around 12 noon and that it was her lunch time. Said Maury told her "you're not leaving for the rest of the day."

**MEMORANDUM DECISION AND ORDER - 7**

("In other words, this is not a situation in which the alleged discriminator gave a biased account to the decisionmaker which led to an adverse employment action, but rather a situation where the account was accurate and was expressly confirmed by the plaintiff. As a result of this admitted conduct, Plaintiff is precluded from establishing a 'cat's paw' theory of liability as a matter of law because there is no evidence that Ms. Faulstich and Ms. Schneberger acted with discriminatory animus.").[4] The undersigned is not so sure.

In leaving work when Miller said to stay, Dickinson was arguably acting insubordinately. Generally speaking, insubordination is grounds for termination. But the facts of Dickinson's firing do not compel such a finding as a matter of law because the context surrounding Dickinson's firing must also be taken into account. When doing so (and when viewing the evidence and its potential inferences in the light most favorable to Dickinson as is required at this stage of the proceedings), it is equally plausible that the allegedly "hostile environment" created by Miller's discriminatory animus induced the purported insubordination which was then offered as justification for Dickinson's firing. Viewed thusly, a factual dispute exists as to whether Miller set in motion and/or otherwise influenced Edward Jones' decision to terminate

---

- Acknowledged she told Maury "I didn't ask you. I told you." Shannon told us she probably shouldn't have said it, and that she felt it was "an extremely hostile environment." She said called RL Chris last night and that "I left."

Ex. K, p. 4 to Jaskowiak Decl. (Docket No. 26, Att. 16).

[4] Also on November 30, 2012, Miller emailed Schneberger, stating:

Martha, I was given your name as a person who will be helping me handle my BOA situation. Well things have escalated today during her review and she walked out without my authorization, and left for the day. We need to discuss this as soon as possible and see if there is a workable solution. As of right now, I do not want her back in my office as this will be non-productive and not good for our clients.

Ex. L to Jaskowiak Decl. (Docket No. 26, Att. 17).

**MEMORANDUM DECISION AND ORDER - 8**

Dickinson. *See Poland v. Chertoff*, 494 F.3d 1174, 1182 (9th Cir. 2007) ("[I]f a [biased] subordinate . . . sets in motion a proceeding by an independent decisionmaker that leads to an adverse employment action, the subordinate's bias is imputed to the employer if the plaintiff can prove that the allegedly independent adverse employment decision was not actually independent because the biased subordinate influenced or was involved in the decision or decisionmaking process.").[5] The summary judgment record here supports a claim that Dickinson's firing was related to Miller's allegedly biased actions. Summary judgment is denied in this respect.

            b.      *Religious Discrimination Claim*

A prima facie case of Title VII discrimination requires that Dickinson show (1) she belongs to a protected class, (2) she was performing her job satisfactorily, (3) she suffered an adverse employment action, and (4) she was treated less favorably than other employees with similar qualifications. *See Vasquez v. Cty. of Los Angeles*, 349 F.3d 634, 640 n.5 (9th Cir. 2003).[6] Dickinson has stated a prima facie case of religious discrimination.

---

[5] Plaintiff additionally argues this is the case because, in October 2012, Miller called AR and reported that Dickinson was having performance issues because of "all the medication she is taking," claiming she blacked out, and was having cognitive problems. *See* Opp. to MSJ, p. 11 (Docket No. 29) (citing Ex. K, p. 6 to Jaskowiak Decl. (Docket No. 26, Att. 16). From this, Plaintiff further contends that Miller "sought to impose some kind of disciplinary action based upon that perceived disability" thus invoking the "cat's paw." Opp. to MSJ, p. 11 (Docket No. 29). Even so, Dickinson later (alternatively) argues that Miller's alleged discriminatory animus need not be imputed to Edward Jones' AR department because Faulstich "was aware of Miller's agenda, and in fact, assisted him with it asking him to provide follow-up documentation on Dickinson" such that "it is unnecessary to tie Miller's discriminatory animus to the final decisionmakers with the 'cat's paw' doctrine." Opp. to MSJ, p. 16 (Docket No. 29). This Order does not speak to these additional arguments vis à vis the application the "cat's paw" theory of liability to the facts involved here.

[6] Plaintiff has sued under the Idaho Human Rights Act ("IHRA") for religious discrimination, disability discrimination, and retaliation. *See* Compl., ¶¶ 52-55, 64-67, 75-80 (Docket No. 1). Federal law guides the interpretation of the IHRA and that the summary judgment analysis is the same under the relevant statutes. *See Hatheway v. Bd. of Regents of Univ. of Idaho*, 155 Idaho 255 (Idaho 2013); *Mackay v. Four Rivers Packing Co.*, 179 P.3d 1064, 1069 (Idaho 2008); *Peterson v. Hewlett-Packard Co.*, 358 F.3d 599, 603 (9th Cir. 2004).

**MEMORANDUM DECISION AND ORDER - 9**

There is no dispute in this record that Dickinson is a member of the LDS religion and therefore belongs to a protected class. *See* Compl, ¶ 13 (Docket No. 1). Dickinson performed her job duties satisfactorily. *See* Pl.'s SOF No. 13 (Docket No. 29, Att. 1) (discussing reviews and monetary raises between 2007 and 2011). Dickinson suffered an adverse employment action when she was terminated and when, just before being terminated, she received smaller bonuses and was given a lower annual review. *See id*. at SOF No. 38; *see also* Ex. A to Jaskowiak Decl. (Docket No. 26, Att. 4) (discussing various ratings for trimester bonuses). Finally, the individual who replaced Dickinson was a member of Miller's church, Calvary Chapel. *See* Pl.'s SOF No. 54 (Docket No. 29, Att. 1).

Under *McDonnell Douglas*, the burden shifts to Edward Jones to articulate a legitimate nondiscriminatory reason for firing Dickinson. On that point, Edward Jones contends that Dickinson's termination was the result of insubordinate conduct which she admitted to Faulstich and Schneberger. *See* Mem. in Supp. of MSJ, p. 11 (Docket No. 26, Att.1). This represents a legitimate nondiscriminatory reason for firing Dickinson.[7]

Under *McDonnell Douglas*, the burden now shifts back to Dickinson to demonstrate that Edward Jones' articulated reason is merely a pretext for discrimination. On that point, Dickinson offers evidence of three types. First, Dickinson argues that her actions were not reflective of insubordination when considering the contextual backdrop of Miller's alleged

---

[7] Dickinson does not dispute that her alleged insubordination is a legitimate nondiscriminatory reason for firing her, but argues that it does not represent a legitimate nondiscriminatory reason for lower ratings on her performance reviews or lower trimester bonuses. *See* Opp. to MSJ, p. 5 (Docket No. 29). The Court need not resolve this issue here, given its resolution of the underlying Motion for Summary Judgment concerning Dickinson's religious discrimination claim.

**MEMORANDUM DECISION AND ORDER - 10**

discriminatory conduct in the first place.  *See* Opp. to MSJ, pp. 7-8 (Docket No. 29) (citing *Robinson v. Southeastern Penn. Transp. Auth.*, 982 F.2d 892, 895-86 (3rd Cir. 1993) ("[D]iscrimination analysis must not concentrate on individual incidents, but on the overall scenario" and that employer's conduct was aimed at "generally trying to provoke [plaintiff] to insubordination."); *see also supra*.  Second, Dickinson alleges that, during her November 30, 2012 performance review, Miller made critical references to her mental state, commenting that "I don't think your medications are dosed correctly," and "I think the election of Obama has made you crazy and tipped you over the edge."  *See* Opp. to MSJ, p. 8 (Docket No. 29); *see also* Pl.'s SOF No. 41 (Docket No. 29, Att. 1); *infra* (discussing ADA's "regarded as" impairment in context of Dickinson's disability discrimination claim).  Finally, Dickinson noted Miller's history of feeling like an outcast and/or discriminated against himself as a non-Mormon in eastern Idaho, and that, after Miller hired two non-Mormons, she felt increasingly isolated in a changing office environment where she was not welcome to participate.  *See* Opp. to MSJ, pp. 8-9 (Docket No. 29) (citing Ex. K, p. 7 to Jaskowiak Decl. (Docket No. 26, Att. 16)); *see also* Pl.'s SOF Nos. 16-18 (Docket No. 29, Att. 1); *see also* Pl.'s SOF Nos. 30-32 (Docket No. 29, Att. 1) (highlighting Miller's support of Obama during 2012 Presidential election "because [Romney] was LDS" and Miller's statements to her after Mr. Romney's loss on Election Day 2012 that "You have no business being in this type of business and in my business.  You get out of here.  I can't afford someone telling my clients that the sky is falling.").  To this end, sufficient evidence exists to create a genuine dispute as to material facts on whether Edward Jones' articulated reason for firing Dickinson was pretextual.  Summary judgment is denied in this respect.

**MEMORANDUM DECISION AND ORDER - 11**

    *c.*  *Disability Discrimination Claim*

To state a prima facie case of ADA discrimination, Dickinson must show that (1) she is a disabled person within the meaning of the ADA, (2) she was able to perform the essential functions of the job, with or without reasonable accommodation, and (3) she suffered an adverse employment action because of her disability. *See Allen v. Pac. Bell*, 348 F.3d 113, 114 (9th Cir. 2003). Again, Dickinson has stated a prima facie case of disability discrimination.

The ADA defines "disability," in part, as "being regarded as having a [physical or mental impairment]." 42 U.S.C. § 12102(1)(C). An individual is "regarded as" having a disabling impairment if she has been subjected to unlawful discrimination "because of an actual or perceived physical or mental impairment whether or not the impairment limits or is perceived to limit a major life activity." 42 U.S.C. § 12102(3)(A). Here, the record supports an argument that Edward Jones regarded Dickinson as disabled. For example, the record of an October 16, 2012 telephone call between Miller and Edward Jones' AR department reads:

> FA, Maury Miller, called about performance concerns with his BOA, Shannon Dickinson. Maury immediately said Shannon has no focus and he believes Shannon's performance concerns are occurring because of all the medication she is taking. I cautioned Maury about making an assumption that medication is the cause for performance concerns. I asked Maury if he has addressed his performance concerns with Shannon. Maury said he approaches the conversation by asking Shannon if she is feeling ok and how things have been going. He will walk out to Shannon's desk to ask this. Maury will ask Shannon if she remembers speaking with a client or what was discussed because she entered something incorrectly or didn't complete a task correctly. I asked about Shannon's response and Maury said she will tell him she remembers the conversation and about Shannon's response and Maury said she will tell him she remembers the conversation and denies doing anything incorrectly. I asked Maury if he does notice any improvement after the conversation and he said no because Shannon's response to him is that she is not doing anything wrong. I asked if clients have shared any concerns or problems and Maury said no. Maury said Shannon will mix up conversations with clients – for example, she spoke with one client about a credit card and the next person that walks in she will think is the exact same client and speak about the credit card when it isn't the correct client

**MEMORANDUM DECISION AND ORDER - 12**

> and they actually have never spoken about a credit card. Maury is concerned that Shannon is going to give incorrect information because Shannon gets very confused while on the phone. He has noticed she doesn't remember something that happened 30 minutes ago. Maury said Shannon had a car accident where she almost drove off a bridge. Shannon told Maury that she blinked and the accident happened. Maury said he believes that she blacked out. Maury made multiple comments about Shannon's medication but said he is very careful with keeping performance separate. Maury said the ratings he has awarded on the BOA trimester bonus have gone down for Shannon to reflect performance. Maury said John has also noticed similar concerns. Maury said he would like additional help in moving forward and with having the conversation with Shannon. Maury asked to be contacted on his cell phone. Emailed notes and ticket to HR Specialist.

Ex. K, p. 6 to Jaskowiak Decl. (Docket No. 26, Att. 16). Then, a week later, Edward Jones' AR department followed up with Miller about these "concerns," with the record of an October 25, 2012 telephone call between Faulstich and Miller reading:

> I spoke with Maury regarding his concerns and explained the caution given to him about his concerns with medication. Maury and I decided I would review the documentation he has and decide if we need to move forward with a call and conversation. Maury said he would get me the documentation by Monday 10/29/12.

*Id.* at pp. 5-6.[8] Additionally, Dickinson points to correspondence between an Edward Jones employee to Miller (in early November 2012), detailing alleged incidents reflecting Dickinson's cognitive problems. *See* Pl.'s SOF No. 34 (Docket No. 29, Att. 1). Finally, during the at-issue performance review, Miller allegedly told Dickinson that her medications were not dosed correctly and that she was having memory problems. *See supra.* Considered together, with inferences drawn in favor of Dickinson, the evidence can show that Dickinson was regarded as disabled – the first element toward establishing a prima facie disability discrimination claim.

---

[8] At least three telephone calls took place in the interim – October 18, 23, and 24, 2012. *See* Ex. K, p. 6 to Jaskowiak Decl. (Docket No. 26, Att. 16). It would appear from the notations that, for each call, Faulstich left a message for Miller. Separately, there is no indication that Miller provided any of the requested documentation by October 29, 2012. *See id.*

**MEMORANDUM DECISION AND ORDER - 13**

Concerning the other elements of the claim, Dickinson was able to perform the essential functions of the BOA position, given her history at Edward Jones and more-or-less positive reviews leading up to her dismissal.  *See supra*.  She also suffered an adverse employment action, having been fired and also having received smaller bonuses and a lower annual review.  *See id*.  Finally, the record cited above also supplies an inference that this adverse employment action was motivated by Dickinson's perceived disability.  *See id.*; *see also* Opp. to MSJ, pp. 13-14 (Docket No. 29) (identifying Miller's phone calls to AR, discussing Dickinson's alleged "performance issues" owing to cognitive problems, statements made by Edward Jones employees to Miller regarding same, and comments made by Miller to Dickinson following Presidential election).  On balance, then, Dickinson has stated a prima facie case of disability discrimination.

Having overcome the first hurdle of the *McDonnell Douglas* three-step burden-shifting framework, the burden shifts to Edward Jones to articulate a legitimate nondiscriminatory reason for firing Dickinson.  This analysis, in addition to the analysis addressing Dickinson's in turn burden to show pretext is, in all relevant aspects, identical to the analyses of Dickinson's religious discrimination claim.  And, like Dickinson's religious discrimination claim, sufficient evidence exists to create a genuine dispute as to material facts on whether Edward Jones' reason for firing Dickinson was pretextual.  Summary judgment is denied in this respect.

      2.      <u>Dickinson's Retaliation Claim</u>

A prima facie retaliation case requires that Dickinson show that (1) she engaged in a protected activity, (2) she suffered an adverse employment decision, and (3) there was a causal link between the two.  *See Bergene v. Salt River Project Agric. Improvement and Power Dist.*, 272 F.3d 1136, 1140-41 (9th Cir. 2001).  Dickinson has not done so.

**MEMORANDUM DECISION AND ORDER - 14**

The basis for Dickinson's retaliation claim relates to (1) a conversation she had with Chris Klein in which she discussed the fact that there were religious conversations taking place within the office, and (2) comments she made during her call with AR following her November 30, 2012 performance review. *See* Compl., ¶¶ 34,42, 69-70 (Docket No. 1). Even if such instances represent protected activity, Dickinson cannot show the necessary link between that protected activity and her termination.

There is no evidence that Edward Jones' AR department (through Faulstich and Schneberger, the individuals responsible for formally firing Dickinson) was aware of Dickinson's conversation with Klein before Dickinson was terminated. *See* Def.'s SOF No. 21 (Docket No. 26, Att. 2) ("Mr. Klein did not report the conversation to Associate Relations."); *see also Cohen v. Fred Meyer*, 686 F.2d 793, 797 (9th Cir. 1982) ("[A]t the time Reynolds made the decision that directly resulted in the adverse action against Bires, he did not know that she had engaged in a protected activity. This breaks the requisite causal link between the decision to implement the policies and Bires' EEOC complaint."). Similarly, before even speaking with Dickinson, Faulstich and Schneberger had already discussed the possibility of terminating Dickinson. *See* SOF Nos. 45-46 (Docket No. 26, Att. 2) (citing Ex. I to Jaskowiak Decl. (Docket No. 16, Att. 14) (email from Faulstich to Schneberger stating: "Just got off the phone with Maury Miller . . . his BOA walked out during the appraisal . . . may want to let her go but want to talk with you about it . . . it is your area."); Exs. C-D to Jaskowiak Decl. (Docket No. 16, Atts. 8-9) (deposition testimony of Faulstich and Schneberger discussing possibility of terminating Dickinson prior to talking with Dickinson).

In short, these realities do not support any inference, even when drawn most favorably in favor of Dickinson as the non-movant, that her termination was the result of the conversations

**MEMORANDUM DECISION AND ORDER - 15**

she had with Klein or Faulstich and Schneberger related to any protected activity. Summary judgment is granted in this respect.

### III. ORDER

Based on the foregoing, IT IS HEREBY ORDERED that Defendant's Motion for Summary Judgment (Docket No. 26) is GRANTED, in part, and DENIED, in part, as follows:

1. Dickinson may proceed with her religious and disability discrimination claims. In these respects, Defendant's Motion for Summary Judgment is DENIED; and

2. Dickinson's retaliation claim is dismissed. In this respect, Defendant's Motion for Summary Judgment is GRANTED.



DATED: **August 26, 2016**

Honorable Ronald E. Bush
Chief U. S. Magistrate Judge

**MEMORANDUM DECISION AND ORDER - 16**